UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BERNARDO ABAN TERCERO, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:06-CV-3384 |
| | § | |
| RICK THALER, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Texas death-row inmate Bernardo Aban Tercero seeks federal habeas relief. Tercero's habeas petition raises several constitutional claims, including that he is exempt from execution under *Roper v. Simmons*, 543 U.S. 551 (2005). After considering the record, the pleadings, and the applicable law, the Court will deny Tercero's habeas petition. The Court will not certify any issue for appellate review.

## BACKGROUND

### I.      The Crime

On March 31, 1997, Robert Berger entered a dry-cleaning establishment with his three-year-old daughter around closing time to drop off clothing. Berger waited at the counter and employee Idalia Lima stood at the back door as her husband took out some trash. As he reentered, two men forced their way inside. One man held Lima and her husband at gunpoint while the other went to the front of the store. There, a scuffle ensued between the second intruder and Berger. After tussling for a moment, the second man shot Berger. As he lay bleeding on the floor, a store clerk tried to move Berger's young daughter so she would not see him dying. The intruders fled with two cash register drawers full of money.

Several months passed without any leads. During that time, the police twice interviewed

Lima, but she did not give any useful information about the murderer's identity. The police eventually learned that Bernardo Aban Tercero, known as "Carlos" or "Nica," had some involvement in the robbery/murder. Additional investigation revealed that Tercero had lived with Lima's sister, Marisol (who was a former employee of the dry cleaners). Lima confessed that she had lied to the police. In her third police statement she fingered Tercero as the killer. She said that when Tercero approached her needing money, she helped orchestrate the robbery.

On September 2, 1997, the State of Texas charged Tercero with capital murder committed during the course of a robbery. By that point Tercero had fled to his home country of Nicaragua. There, Tercero engaged in a series of armed offenses, including several robberies, shootings, and a kidnapping. Eventually, the FBI obtained a federal warrant for Tercero's flight to avoid prosecution. Two years later, Tercero was arrested upon reentry to the United States.

## II.    The Trial

The trial court appointed Gilbert Villarreal and John Derringer to represent Tercero. Trial testimony provided competing versions of Lima's involvement in the crime. Lima testified that Tercero had threatened to harm her and her family if she did not help him commit the robbery. Tercero took the stand and testified that Lima was a willing participant who he paid for her help.

The thrust of Tercero's defense, however, was that he lacked a specific intent to kill. While the defense capitalized on ballistics evidence, Tercero's trial testimony formed the core of the defense's case. Tercero testified that, as he approached the front of the store, Berger tried to grab the gun from him. Their struggle caused Tercero, who had his finger on the trigger, to fire his weapon. The trial court instructed the jury to consider the lesser-included offenses of felony murder and aggravated robbery. The defense conceded Tercero's guilt to aggravated robbery

and told the jury to find him guilty of felony, not capital, murder.

The prosecution, however, strongly disputed Tercero's version of the offense.  The prosecution told the jury to infer Tercero's intent from the facts, particularly because Tercero had coerced Lima into helping him rob the store and he took a loaded gun with him.  The State emphasized that an eyewitness saw Tercero assault Berger, who only acted defensively.  In fact, Tercero told another witness after the murder that he shot Berger because he made him angry and could identify him.  The jury convicted Tercero of capital murder.

At the time of trial, a capital-murder conviction left two sentencing options: death or life with the possibility of parole after 40 years.  After a separate punishment hearing, the jury would decide Tercero's sentence by answering two special issue questions:

Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Bernardo Aban Tercero, would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue No. 2

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Bernardo Aban Tercero, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 153, 155.

The State emphasized Tercero's persistent and vicious history of lawlessness.  Tercero had twice been convicted of theft.  The State stressed the senselessness and brutality with which Tercero killed the victim in this case.  Witnesses also described Tercero's wanton lawlessness when he returned to Nicaragua.  In short, the prosecution put forth a strong case for a death sentence.

The defense called eight witnesses, including Tercero's family members from Nicaragua, who described him as having a generally good character.  Family members pleaded for mercy and testified that Tercero was capable of rehabilitation.  A jail employee testified that Tercero had not been violent while awaiting trial.  A jail chaplain explained that Tercero had shown remorse and had sought a sincere relationship with God.

The jury answered the special issues in a manner requiring the imposition of a death sentence.  Tercero filed a timely motion for a new trial.  The trial court denied the motion.[1]

## III.    Direct Appeal and State Habeas Review

Tercero sought appeallate review on six points of error.[2]  The Court of Criminal Appeals affirmed his conviction and sentence.  *Tercero v. State*, No. 73,992 (Tex. Crim. App. Sept. 19, 2002) (unpublished).  Tercero does not renew in federal court any of the complaints he raised on direct review.

During the pendency of his direct appeal, Tercero filed a state application for habeas corpus relief through appointed counsel.  Tercero's 55-page application raised five grounds for relief, three of which addressed the introduction of victim-impact testimony at trial and two of which focused on the structure of the penalty phase.  State Habeas Record at 2-63.  Over two years later, and after the State of Texas filed a response, Tercero filed a *pro se* motion to amend

---

[1] In a post-judgment hearing, Lima testified that she actually had seen Tercero and the victim struggle for the gun. She said that the police allegedly threatened her and that the prosecutor instructed her not to mention anything that would benefit Tercero.  The prosecution's interpreter and others present during interviews with Lima strongly disputed her post-trial testimony.

[2] Tercero alleged: (1) the trial court erred in granting a challenge for cause during voir dire; (2) the trial court erroneously refused to instruct the jury on a lesser-included offense; (3) insufficient evidence supported the jury's finding that he would be a future societal danger; (4) the trial court improperly excluded testimony that a witness had identified Tercero through an impermissibly suggestive procedure; (5) the prosecutor improperly called Tercero a "demon" during the penalty phase; and (6) the prosecutor improperly called Tercero a "beast" during the penalty phase.

his habeas application.  State Habeas Record at 67-74.[3]  By that point in the habeas litigation, Texas law prohibited the insertion of new claims.

The parties' proposed findings of fact and conclusions of law only addressed the claims raised in the application filed by state habeas counsel.  The lower state habeas court signed the State's proposed findings and conclusions recommending that the Court of Criminal Appeals deny relief.  State Habeas Record at 137-49.  The Court of Criminal Appeals adopted the lower court's recommendation and denied relief.  In the same order, the Court of Criminal Appeals found Tercero's *pro se* application "to be a subsequent application" because he filed it "after the deadline provided for an initial application for habeas corpus."  As the *pro se* application "fail[ed] to meet one of the exceptions provided for in Section 5 of Article 11.071," the Court of Criminal Appeals "dismiss[ed] this subsequent application as an abuse of the writ."  *Ex parte Tercero*, No. WR-62,592-01 and WR-62,593-02 (Tex. Crim. App. Nov. 16, 2005).

## IV.   Federal Habeas and Successive State Habeas Review

This Court appointed counsel to represent Tercero throughout the federal habeas process.  On October 24, 2006, Tercero filed a *pro se* federal petition for a writ of habeas corpus raising four grounds for relief.  (Instrument No. 1).[4]  Appointed counsel subsequently filed an amended federal petition adopting the issues raised in the *pro se* petition and inserting others for the first time on federal review.  (Instrument No. 6).  Tercero pursues federal habeas corpus relief on the

---

[3] Tercero's *pro se* application raised the following grounds for relief: (1) trial counsel provided ineffective assistance by failing to investigate the circumstances surrounding Tercero's arrest, interrogation, and invocation of his consular rights; (2) the State presented false testimony through Lima; (3) the State suppressed evidence relating to the falsity of Lima's trial testimony; and (4) trial counsel provided ineffective assistance by failing to engage in a meaningful investigation of mitigating evidence.

[4] Tercero's *pro se* federal petition alleged that: (1) trial counsel provided ineffective assistance in failing to investigate the circumstances surrounding his arrest and subsequent interrogation; (2) the prosecutor withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), relating to a statement from Lima; (3) trial counsel provided ineffective assistance when he ignored Tercero's directive to call a witness, Sylvia Cotera, at trial; and (4) the Supreme Court's decision in *Roper* bars Tercero's execution because he was 17 years old when he killed the victim.

following claims:

1.  Trial counsel provided ineffective assistance by failing to (a) investigate Tercero's case properly; (b) engage in a proper mitigation investigation; (c) obtain Tercero's medical and school records; and (d) investigate the violation of Tercero's rights under the Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, [1970] 21 U.S.T. 77.

2.  The prosecution withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), relating to Lima's testimony.

3.  Trial counsel provided ineffective assistance when he ignored Tercero's directive to call a witness, Sylvia Cotera, at trial.

4.  The Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005) bars Tercero's execution because he was 17 years old when he killed the victim.

5.  Federal and state agents ignored Tercero's requests for consular assistance in violation of his Vienna Convention rights.

6.  Appellate counsel provided ineffective assistance in failing to raise a claim of prosecutorial misconduct on direct review.

7.  State habeas counsel provided constitutionally deficient representation.

8.  The Texas Court of Criminal Appeals failed to safeguard Tercero's statutory right to "competent counsel" on state habeas review.

9.  Insufficient evidence supported the jury's decision that Tercero would be a future danger to society.

Respondent filed an answer alleging that Tercero had not presented any of his claims in a procedurally adequate manner. (Instrument No. 19). Specifically, Tercero procedurally defaulted portions of claim one and all of claims two and three on state habeas review. Respondent also argued that Tercero violated the exhaustion doctrine found in 28 U.S.C § 2244(b)(2) by presenting the remainder of his claims for the first time on federal review.

On March 31, 2008, the Court stayed and administratively closed this action to allow

Tercero to present his unexhausted claims to the state courts.  (Instrument No. 32).[5]  Tercero

filed a successive state habeas application raising only his *Roper* claim.  The Court of Criminal

Appeals granted Tercero leave to proceed with his successive habeas application and remanded

the action to the state trial court.  After considering the parties' arguments and evidence, the trial-

level habeas court entered findings and conclusions recommending the denial of relief.  On

March 3, 2010, the Court of Criminal Appeals adopted the lower court's recommendation and

denied relief.  *Ex parte Tercero*, WR-62,593-03, 2010 WL 724405 (Tex. Crim. App. Mar. 3,

2010) (unpublished).

This Court reopened Tercero's federal habeas action.  (Instrument No. 35).  Tercero filed

a second amended petition that adopted his earlier arguments and reurged his *Roper* claim in

light of the state-court action.  (Instrument No. 45).  Respondent has filed a supplemental answer

(Instrument No. 53) to which Tercero has replied (Instrument No. 61).  The parties have also

provided additional briefing about the application of the Anti-Terrorism and Effective Death

Penalty Act ("AEDPA").  (Instrument Nos. 71, 76).  This matter is ripe for adjudication.

## PROCEDURAL LIMITATIONS ON FEDERAL HABEAS REVIEW

Federal habeas corpus review provides a tightly circumscribed examination of state

criminal judgments.  While "the Framers considered the writ a vital instrument for the protection

of individual liberty," *Boumediene v. Bush*, 533 U.S. 723, 743 (2008), principles of finality,

comity, and federalism narrow the scope of federal habeas review.  *See Barefoot v. Estelle*, 463

U.S. 880, 887 (1983) ("The role of federal habeas proceedings . . . secondary and limited.");

*Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and

enforcing the criminal law.").  Respondent argues that procedural law forecloses federal review

---

[5] This Court's order staying the case specifically discussed Tercero's *Roper* claim, but clarified that a stay would "allow Tercero to exhaust the other claims he has not presented to the state courts."  (Instrument No. 32 at 11, n.5).

of all but one claim.

Federal courts have long required inmates to give state courts the first chance to rectify constitutional violations.  *See Ex parte Royall*, 117 U.S. 241, 251-52 (1886).  To avoid the "'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), the AEDPA requires an inmate to raise his federal habeas claims in the highest state court before federal review becomes available.  *See* 28 U.S.C. § 2254(b)(1).  The AEDPA precludes federal review over unexhausted claims for any purpose other than to deny their merits.  *See* 28 U.S.C. § 2254(b)(2).  Tercero raised claims five through nine, and part of claim one, for the first time in his federal habeas petition.[6]  He did not advance those claims when this Court stayed his case for the exhaustion of state-court remedies.  Accordingly, the AEDPA precludes this Court from affording habeas relief on those issues.  *See* 28 U.S.C. § 244(b)(2).

The procedural default doctrine, which functions as a "[a] corollary to the habeas statute's exhaustion requirement," also constricts the scope of federal habeas review.  *Dretke v. Haley*, 541 U.S. 386, 392-93 (2004); *see also Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (stating that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment").  Federal practice limits habeas review to those claims that an inmate presented in compliance with state procedural law.  *See Haley*, 541 U.S. at 392; *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman*, 501 U.S. at 729.  If an inmate fails to follow well-established state procedural requirements for attacking his conviction or sentence,

---

[6] Tercero's *pro se* habeas application did not include his complaint that trial counsel failed to champion his Vienna Convention rights (claim 1(d)).

and the state court thereby finds that he has defaulted consideration of any issues, a procedural

bar precludes federal adjudication.  *See Lambrix*, 520 U.S. at 523; *Coleman*, 501 U.S. at 732.

Tercero raised claims two and three, as well as part of claim one, in his *pro se* state

habeas application.  The Court of Criminal Appeals dismissed Tercero's *pro se* application as an

abuse of the writ.  *Ex parte Tercero*, No. WR-62,592-01 and WR-62,593-02 (Tex. Crim. App.

Nov. 16, 2005).  Tercero's failure to present his claims to the state courts in a procedurally

adequate manner bars federal courts from considering their merits.

Similarly, a petitioner's failure to exhaust his claims results in a federal procedural bar.

*See Horsely v. Johnson*, 197 F.3d 134, 137 (5th Cir. 1999).  "A procedural default . . . occurs

when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner

would be required to present his claims in order to meet the exhaustion requirement would now

find the claims procedurally barred.'"  *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997)

(quoting *Coleman*, 501 U.S. at 734 n.1); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir.

1993) (holding that when "it is obvious that the unexhausted claim would be procedurally barred

in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally

barred from habeas review").  Because Tercero never presented his unexhausted claims in his

previous state habeas applications, Tᴇx. Cᴏᴅᴇ Cʀɪᴍ. Pʀᴏ. art. 11.071 § 5 would prohibit the state

courts from considering them in a subsequent application.  Texas' abuse-of-the-writ doctrine,

therefore, forecloses federal review.  Only Tercero's *Roper* claim is not subject to a procedural

bar.

Judicial accommodation prevents a state procedural default from becoming an

insurmountable barrier to federal review.  In *Coleman v. Thompson*, the Supreme Court

recognized that a federal petitioner may overcome the default of his claims if he can

"demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law[.]."  501 U.S. at 750 (emphasis added).[7]   A petitioner shoulders the burden of meeting the cause and actual prejudice standard.  *See McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991).

Tercero argues that ineffective representation by his habeas attorney should forgive the procedural impediments to federal review.  (Instrument No. 31 at 8-9).  When Tercero filed his federal habeas petition, well-settled Fifth Circuit law decisively held that habeas counsel's representation could not constitute cause.  *See, e.g., Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001).  However, the Supreme Court in *Martinez v. Ryan* recently found that deficient performance by a state habeas attorney may amount to cause under some circumstances.  The *Martinez* court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, ___ U.S. at ___, 132 S. Ct. at 1320.  The *Martinez* Court reasoned that when, as in Arizona, inmates can only raise *Strickland* claims on state habeas review, a state habeas attorney's deficient performance may forgive a federal procedural bar.

The Fifth Circuit, however, subsequently held that *Martinez* does not apply to federal habeas cases arising from Texas convictions.  *See Foster v. Thaler*, 481 F. App'x 229, 230 (5th Cir.) (unpublished), *cert. denied*, ___ U.S. ___, 2012 WL 4365081 (Sept. 25, 2012); *Newbury v.*

---

[7] A federal court may also adjudicate barred claims if "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  A fundamental miscarriage of justice "is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  Tercero does not claim that he is actually innocent.

*Thaler*, 481 F. App'x 953 (5th Cir. 2012) (unpublished); *Ayestas v. Thaler*, 475 F. App'x 518 (5th Cir. 2012) (unpublished); *Gates v. Thaler*, 476 F. App'x 336, 342 (5th Cir. 2012) (unpublished); *Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012). "*Martinez*, by its own terms, . . . establishes a specific and narrow exception to the *Coleman* doctrine[.]" *Ibarra*, 687 F.3d at 225-26.  Unlike in Arizona, Texas inmates can raise *Strickland* claims in a motion for a new trial or on direct appeal.  Thus, the Fifth Circuit reasons that Texas inmates are "not entitled to the benefit of *Martinez* for [their] ineffectiveness claims[.]" *Ibarra*, 687 F.3d at 227.

The Supreme Court has recently granted certiorari review in a case that will decide whether *Martinez* applies to Texas. *See Trevino v. Thaler*, 568 U.S. ___ (2012).[8]  Fifth Circuit precedent "remains binding until the Supreme Court provides contrary guidance." *Neville v. Johnson*, 440 F.3d 221, 222 (5th Cir. 2006).  Nevertheless, even if the Court assumes that *Martinez* applies to Texas, Tercero has not met his burden to overcome the procedural bar of his claims.

Tercero complains that his state habeas attorney is responsible for defaulting all the claims procedurally unavailable on federal review. *Martinez*'s protections explicitly extend only to "a substantial claim of ineffective assistance at trial[.]" *Martinez*, ___ U.S. ___, 132 S. Ct. at 1320.  Of the eight claims that Tercero faults counsel for not raising, only two relate to trial counsel's representation.  State habeas review was not the first or only forum to raise his additional grounds for relief, such as his *Brady* or insufficiency-of-the-evidence claims. *Martinez* only would allow claims one and three to serve as precursors to an ineffective-assistance-of-habeas-counsel claim.

*Martinez* reaffirmed that an inmate only meets the cause requirement by showing that the

---

[8] The Supreme Court has also stayed the execution of Texas inmates raising a *Martinez* issue. *See Haynes v. Thaler*, 133 S. Ct. 498 (2012); *Balentine v. Thaler* 133 S. Ct. 90 (2012).

"attorney in his first collateral proceeding was ineffective" and that the underlying "claim of ineffective assistance of trial counsel is substantial." *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1321. Then, the inmate must also show "actual prejudice." *Id.* Tercero's pleadings fail to prove either cause or prejudice.

The cause test relies on the ineffective-assistance-of-counsel standard from *Strickland v. Washington*, 466 U.S. 668 (1984) to assess an attorney's efforts. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution."); *Murray v. Carrier*, 477 U.S. 478, 492 (1986) ("Attorney error short of ineffective assistance of counsel does not constitute cause[.]"). A petitioner meets *Strickland*'s standards by showing that "a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added). In the *Martinez* context, a petitioner must make a dual *Strickland* showing to overcome a procedural bar. A petitioner must demonstrate (1) deficient performance and resulting prejudice in habeas counsel's failure to raise a claim based on (2) trial counsel's deficient performance and prejudice. Here, Tercero has not shown that state habeas counsel's failure to raise claims one and three amounts to deficient performance.

Tercero makes brief, but broad, allegations that fault state habeas counsel for not performing an adequate investigation or presenting meritorious arguments. (Instrument Nos. 6 at 10; 45 at 12-13). Tercero's briefing, however, does nothing more than observe that habeas counsel did not raise his now-barred grounds for relief. Such perfunctory argument is insufficient to show cause. *See Smith v. Murray*, 477 U.S. 527, 535 (1986) ("'[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim

despite recognizing it, does not constitute cause for a procedural default.'") (quoting *Carrier*, 477 U.S. at 486-87). An effective attorney does not raise every nonfrivolous claim. In fact, the process of "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective . . . advocacy." *Smith*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

Tercero's briefing does not indicate that state habeas counsel, who filed a lengthy application raising five grounds for relief, ignored strong arguments against trial counsel's representation. Tercero has only made a passing effort to show that claims one and three would constitute viable grounds for habeas relief. Those claims make summary allegations that trial counsel provided ineffective assistance by failing to investigate Tercero's case; engage in a proper mitigation investigation; obtain Tercero's medical and school records; argue that the State denied Tercero's Vienna Convention rights; and call Sylvia Cotera to testify at trial. Tercero, however, has not substantiated those allegations. His pleadings do not specify what investigation trial counsel ignored or how it would have impacted his defense. Tercero has not supported his allegations with affidavits or other admissible evidence that a reasonably effective attorney would have put before the jury. Tercero has not produced his school or medical records, amassed unpresented material, or identified unpursued mitigating theories. He has not substantiated any previously unarticulated legal objections.[9] Tercero has not proven that trial counsel provided defective representation, much less that habeas counsel should have raised the

---

[9] Additionally, Tercero has not shown that trial counsel missed making game-changing legal objections or calling important fact witnesses. For example, Tercero faults trial counsel for not objecting to an alleged violation of his Vienna Convention rights, yet the law does not recognize an individually enforceable right under that treaty, *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338 (2006), *Leal Garcia v. Quarterman*, 573 F.3d 214, 218 n.19 (5th Cir. 2009), *Medellín v. Dretke*, 371 F.3d 270, 280 (5th Cir. 2004). Also, Tercero has not proven that trial counsel erred by not calling Ms. Cotera as a defense witness. Ms. Cotera testified for the prosecution. Tercero has not explained how calling her as a defense witness would have resulted in testimony different from trial counsel's lengthy cross-examination of her.

defaulted ineffective-assistance claims in his habeas application.  *See Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000) (recognizing the "strong presumption of reliability to judicial proceedings and requir[ing] a defendant to overcome that presumption by show[ing] how specific errors of counsel undermined the reliability of the finding of guilt[.]").   Tercero has not demonstrated cause to overcome the procedural bar.

In addition to not meeting the cause standard, Tercero's pleadings also fall short of proving actual prejudice.  "The Supreme Court has been reluctant to define the precise contours of the prejudice requirement."  *Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000); *see also Williams v. Taylor*, 529 U.S. 420, 444 (2000) (leaving to the lower courts "[q]uestions regarding the standard for determining the prejudice that petitioner must establish to obtain relief").  Still, Tercero must show more than "a possibility of prejudice," but that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 168 (1982); *see also Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Felder v. Johnson*, 180 F.3d 206, 215 n.12 (5th Cir. 1999).  For the same reasons that he has not shown cause, Tercero's cursory arguments cannot prove actual prejudice.  This Court cannot reach the merits of Tercero's barred claims.[10]

Tercero did not give the state courts a fair opportunity to consider most of his claims. State habeas counsel's failure to include those claims in Tercero's initial state habeas application cannot forgive their default.  Thus, this Court cannot reach the merits of claims one through three and five through nine.[11]  Only Tercero's fourth claim – that his age at the time of the crime

---

[10] This Court has reviewed the merits of Tercero's barred claims in the alternative and, if no procedural impediments foreclosed federal review, the Court would still deny his federal habeas petition.

[11] The Court observes that the exceptions to the procedural-bar doctrine rest on the operation of equity.  *See Haley*, 541 U.S. at 393.   Tercero did not give Texas an opportunity to consider his unexhausted claims on initial habeas review, a circumstance he blames on habeas counsel.  When the Court gave him the opportunity to exhaust all "claims he has not presented to the state courts," (Instrument No 32 at 11, n.5), he chose only to raise his *Roper*

makes him ineligible for a death sentence – is fully available for federal review.

**TERCERO'S *ROPER* CLAIM**

The Supreme Court in *Roper v. Simmons*, 543 U.S. 551 (2005), held that the Eighth Amendment prohibits the execution of offenders who were minors when they killed.  The *Roper* Court stated: "The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest."  *Id*. at 574.  Tercero claims that he was under age 18 when he committed the murder for which he received a death sentence.  To prevail, he must show that he was born after March 31, 1979 (18 years before the murder).

## I.      Background

### A.      Indicators of Tercero's Age Before the *Roper* Decision

Before the Supreme Court issued the *Roper* decision, nothing indicated that Tercero was a minor when he killed.  The indictment against Tercero listed his birth date as August 20, 1977.  Clerk's Record at 3.  While differing somewhat in the particulars, the testimony and evidence from trial confirmed that Tercero was over 18 when he committed the capital murder.  For example, the defense submitted into evidence the translation of a certificate from Posoltega, Nicaragua showing that Tercero was born on August 20, 1977 (hereinafter "1977 Posoltega birth certificate").  Tr. Vol. 27, DX-3.  The defense also submitted a Nicaraguan police report that listed his age as 22 at the time of an arrest in August of 1998.  Tr. Vol. 27, DX-3.  When previously arrested in the United States, Tercero gave a birth date of August 20 in either 1976 or 1977. Witnesses who knew Tercero as a youth provided trial testimony that described his age in

---

claim.  Tercero's choice not to present his unexhausted claims when given the opportunity to do so also cuts against the operation of equity in his favor.

a way inconsistent with a *Roper* claim.[12]  Importantly, Tercero himself testified that he was 24

years old at the time of trial (October 2000).  Tr. Vol. 19 at 18.  Additionally, Tercero explained

that he came to the United States in 1993 when he was 17 years old.  Tr. Vol. 19 at 19, 72.  In

sum, nothing at the time of trial suggested that Tercero was a juvenile when he committed the

murder for which he received a death sentence.

> **B.**     **The Parties' Evidence and Arguments**

After the Supreme Court decided *Roper* in 2005, Tercero for the first time claimed to

have been under age 18 at the time of the murder.  Through subsequent briefing, Tercero's

arguments supporting his *Roper* claim have evolved.   The federal petition filed through

appointed counsel summarily argued that Tercero was born on August 20, 1979.  In support,

Tercero filed only one piece of evidence, a "Certificado de Naciemiento" ("birth certificate")

issued by the "Registro del Estado Civil de Las Personas" in Chichigalpa, Nicaragua showing a

birth date in 1979 (Instrument No. 6, Exhibit A; hereinafter "1979 Chichigalpa birth

certificate").[13]  The document includes two other dates: a "fecha de inscripicion" of January 1,

1980, and a "fecha de emision" of April 18, 2005.  (Instrument No. 6).

Importantly, Tercero's initial federal petition did not explain why Tercero and others had

previously considered him to be born much earlier than the date reflected in the 1979

Chichigalpa birth certificate.  Curiously, his federal petition did not clarify why that document

bore a "fecha de emision" of April 18, 2005, a date only six weeks after the Supreme Court

handed down *Roper*.

---

[12] An uncle testified that he has known Tercero since 1987 when he was 10 years old.  Tr. Vol. 23 at 105.  A friend, Michael Alberto Mondragon, testified that he met Tercero when he was five years old in approximately 1982.  Tr. Vol. 23 at 129-30.  His friend's mother testified that Tercero left to live in the United States when he was 18.  Tr. Vol. 23 at 170-71.  Another uncle testified that Tercero "was 18 years old" when he left Nicaragua.  Tr. Vol. 23 at 203; Tr. Vol. 24 at 6.

[13] Tercero also attached to his petition a copy of his mother Lydia Tercero Hueto's trial testimony that established the names of his parents, but otherwise did not support his *Roper* claim.

Respondent's original answer alleged that someone altered Nicaraguan birth records after the Supreme Court issued its *Roper* decision.  According to Respondent, Nicaraguan law requires parents to inscribe a child's birth at the local civil registry with little official oversight. Nicaraguan law also allows the information on the birth certificate to be changed through judicial order.  When a change is requested, the civil registry office provides a "literal" which is an official transcript of the inscription history and subsequent modification.

Respondent asserts that "the evidence overwhelmingly demonstrates that Tercero was born in August 1976, and suggests that the modification of the birth date on his Chichigalpa inscription may have been an attempt to disguise the true date of his birth." (Instrument No. 19 at 31).  Respondent explains that the "fecha de emision" on the 1979 Chichigalpa birth certificate means someone changed the Nicaraguan registry entry to show a 1979 birth.  With the assistance of the Fraud Prevention Unit of the United States Embassy in Nicaragua, Respondent obtained additional documentary evidence and insight into the 1979 Chichigalpa birth certificate.  In the answer to Tercero's petition, Respondent provided the Court with:

1.  A certificate that Tercero gave Respondent from the Civil Registrar Office of Chichigalpa indicating that someone modified the 1979 Chichigalpa birth certificate on October 20, 2006, only three weeks before Tercero filed his *pro se* federal petition.  (Instrument No. 19, Exhibit A). Respondent also submits a second certificate indicating that someone rectified the birth records on October 20, 2006.  (Instrument No. 19, Exhibit C).

2.  Another birth certificate for Tercero from Posoltega, Nicaragua, this time showing an August 20, 1976 birth.  (Instrument No. 19, Exhibit B; hereinafter "1976 Posoltega birth certificate").  This certificate shows a registry date of August 30, 1976, and was signed by the registrar on May 16, 1977.

3.  The "literal" from the 1979 Chichigalpa birth certificate reflecting that on July 14, 2006, Nicaraguan Judge Matha R. Navarrete M. ordered that his inscription be changed to reflect an inscription date of January 7, 1980,

and a birth date of August 20, 1979.  These changes were recorded on
October 20, 2006.  (Instrument No. 19, Exhibit C).

With that evidence, Respondent argued that "Tercero's date of birth was originally inscribed as
August 20, 1976, the same as the Posoltega inscription, but that . . . it was modified for some
unknown reason to show his birth as being three years later."  (Instrument No. 19 at 31).

Respondent argued that "Tercero has not provided any convincing evidence to illustrate
that his modified Chichigalpa inscription now contains credible information about his birth
date."  (Instrument No. 19 at 32).  Respondent, however, did not subsequently oppose Tercero's
request for investigative assistance. (Instrument No. 25).  Given the important factual issues
relating to Tercero's age, and the strange modification of the birth information after the *Roper*
decision, this Court allowed Tercero to retain an investigator, Norma Villanueva, who traveled to
Nicaragua.  (Instrument No. 26).  Tercero's reply to Respondent's answer relied on Villanueva's
investigation to explain the renovation of his birth certificate.   At the same time, her
investigation raised for the first time a bizarre set of circumstances that allegedly resulted in the
different birth certificates.

Ms. Villanueva produced an affidavit attesting that the Office of Registry in Chichigalpa,
Nicaragua contains birth registrations for (1) a Bernardo Aban Tercero who was born on August
20, 1976, and registered by his mother on August 30, 1976, and (2) a Bernardo Aban Tercero
who was born on August 20, 1979, and registered by his mother in January of 1980.  Tercero did
not provide the Court with a copy of those official entries.  Instead, Tercero submitted a different
certificate from Chichigalpa, this one with the August 20, 1979 birth date but reflecting a 2006
rectification and bearing a 2007 certification.  (Instrument No. 31, Exhibit B).

Now, however, Tercero had to explain why the Nicaraguan records contained birth
entries for two children named Bernardo Aban Tercero.   Villanueva secured undated and

unnotarized declarations from family members and friends in Nicaragua explaining the different birth certificates.   At trial, Tercero's mother had testified that Tercero was the oldest of her children.  Tr. Vol. 23 at 191, 195.  An uncle had explained that Tercero was the first grandchild in the family.   Tr. Vol. 23 at 198.   Villanueva, however, uncovered information allegedly suggesting that their testimony was incorrect or incomplete.   The declaration from Tercero's mother states that she gave birth to a son named Bernardo Aban Tercero in 1976.  Two years later, that son died after she found a scorpion in bed with him.  She later had a second son, the petitioner in the instant action, and also named him Bernardo Aban Tercero.  (Instrument No. 31, Exhibit C).  Additional documents from friends and family members recall the birth, death, and funeral of the first son, although they differ somewhat in various details.  (Instrument No. 31, Exhibits D though H).

With different birth certificates in the record  –  from two different cities and from three different years – the Court recognized that factual questions remained unresolved.  In particular, the Court observed various conflicts or deficiencies in the record, to wit:

1.   The parties make many statements about the operation of Nicaraguan law without providing legal citation or expert testimony explaining birth registry under Nicaraguan law.

2.   Tercero has not explained why he and others gave allegedly incorrect testimony at trial about his true birth date.  Tercero has not explained how he came to confuse himself with his dead older brother.

3.   Information before the Court indicates that Tercero may have been born in 1976, 1977, or 1979.  The only documentation before the Court that does not flow from the renovation of Tercero's birth date after *Roper* shows that his age makes him eligible for execution.   While Tercero's investigator claims that the official birth registry in Nicaragua contains an entry for his birth in 1979, Tercero has not provided the Court with an authenticated copy of that information.

4.   The testimony and evidence at trial, as well as the new affidavits, give widely varying accounts of Tercero's parentage.  The failure to identify

his correct father has muddied the accounts of two sons named Bernardo Aban Tercero and raises credibility questions.

5. Tercero's mother testified at trial that Tercero was the oldest of her children, Tr. Vol. 23 at 191, 195, and an uncle testified that Tercero was the first grandchild in the family, Tr. Vol. 23 at 198. Tercero's mother does not reconcile this testimony, and other inconsistencies, with the new account about the mysterious older son.

6. Tercero makes the incredible allegation, which is noticeably absent from the new affidavits, that both sons named Bernardo Aban Tercero were born on August 20. This unlikely happenstance, unless verified, not only raises credibility issues but handicaps his ability to secure relief. Tercero must not only show that he was born in 1979, but must prove with precision that he was not born before March 31 of that year, and thus was under 18 when the crime occurred.

7. Tercero's claim that he was a minor when the crime occurred only arose after the Supreme Court issued the *Roper* decision, making the evolving tale that supports his allegation suspect without additional credible support.

(Instrument No. 32 at 7-9). The Court stayed the instant action to allow Texas the first opportunity to consider Tercero's *Roper claim.*

## C. Successive State Habeas Review

Tercero filed a successive state habeas application in the Court of Criminal Appeals. Tercero, however, did not present the Texas courts with any new evidence or argument. In fact, Tercero only filed two items of evidentiary support with his successive state application: the birth certificate showing a 1979 birth and the transcript of his mother's trial testimony. His successive application did not mention the existence of a dead older brother, much less include the materials produced from Villanueva's investigation.

The Court of Criminal Appeals remanded the action to the lower court for factual development. The State of Texas filed a response to the successive application which included all of the evidence presented in the federal action, including that amassed by Tercero's

investigator.  Second State Habeas Record at 75-172.[14]  The State's response, however, did not

discredit Tercero's *Roper* claim by challenging the results of Villanueva's investigation.  Instead,

the State emphasized that Tercero had consistently represented his date of birth being in 1976 or

1977 before the murder.   In addition to the previously mentioned pre-*Roper* indicators of

Tercero's age, the State pointed to the following:

1.  Tercero had relied on the birth certificate showing a birth date of August 20, 1977, when obtaining a Texas identification card from the Texas Department of Public Safety in 1994.

2.  Tercero's criminal history lists his birthdate as either August 20, 1976 or August 20, 1977.

3.  When arrested twice previously in Harris County, Tercero gave a false name but used the August 20, 1977, date of birth.

4.  In 1996 and 1999 the United States Immigration and Naturalization Service charged Tercero with Unlawful Entry in 1996 and 1999 and used the August 20, 1976 and August 20, 1977 birth dates.

5.  When apprehended in 1999 and booked into the Hidalgo County, Texas, jail, the booking information includes a date of birth of August 20, 1976.

6.  The FBI listed in wanted posters and charged him with Unlawful Flight to Avoid Prosecution - Capital Murder using the August 20, 1976 date.

7.  During an August 26, 1999 interview with FBI Special Agent Rick Gannaway, Tercero indicated his date of birth was August 20, 1976.

On August 7, 2009, the lower habeas court found that "no controverted, previously

unresolved factual issues material to the legality of [Tercero's] confinement exist."  Successive

State Habeas Record at 333.  The parties filed proposed factual findings and legal conclusions.

Without holding a hearing, the lower court signed the State's proposed findings.

The findings did not address the Nicaraguan birth certificates or the affidavits Tercero

---

[14] Curiously, the amended petition Tercero filed when he returned to federal court claims that he submitted that evidence to the state courts.  (Instrument No. 45 at 15-16) ("The evidence *the Petitioner presented to the trial court was that which was presented to this court in the earlier proceeding.*") (emphasis added).

submitted in federal court.  Instead, the findings listed the numerous times Tercero or others have

represented his birth as being in 1976 or 1977 and found in relevant part:

> The Court, in light of the ample documentation of and [Tercero's] prior continual
> assertion of a birthdate establishing that he was well over the age of eighteen at
> the time of the offense, finds unpersuasive and incredible the alleged birth record
> provided by [Tercero] in the instant writ asserting a birthdate of August 20,1979.
>
> The Court finds that [Tercero] fails to show by a preponderance of the evidence
> that he was under the age of eighteen at the time of the offense.

Successive State Habeas Record at 352.

The Court of Criminal Appeals adopted the lower court's findings without alteration and

denied relief.  *Ex parte Tercero*, 2010 WL 724405, at *1 (Tex. Crim. App. 2010).   The Court of

Criminal Appeals stated:

> The trial court, without holding an evidentiary hearing, adopted the State's
> proposed findings of fact and conclusions of law recommending that relief be
> denied because Applicant has failed to show by a preponderance of the evidence
> that he was younger than 18 years of age when he committed the instant offense.
> This Court has reviewed the record with respect to the allegation made by
> applicant. We adopt the trial judge's findings and conclusions. Based upon the
> trial court's findings and conclusions and our own review, we deny relief.

*Id.*  The parties then returned to federal court.

### D.    Renewed Federal Proceedings

After this Court reopened the case Tercero filed another amended petition relying on the

same arguments and evidence he had presented earlier in the federal action.  With regard to the

state court's rejection of his *Roper* claim, Tercero complained that the state court decision "did

nothing to address or counter the substantial evidence pertaining to the actual authenticity of the

Petitioner's [1979] birth records . . . nor did they address the veracity of the affidavits obtained

by [his investigator]."  (Instrument No. 45 at 18-19).   Tercero conceded that the evidence

"show[ed] **inconsistent** dates of birth," but faulted the state court for doing "nothing to attempt

to resolve the inconsistencies."  (Instrument No. 45 at 19).

Respondent filed a new answer arguing that the AEDPA affords deference to the state court's decision.  In addition to relying on the state court findings, Respondent challenged the 1979 Chichigalpa birth certificate and the declarations explaining Tercero's birth.  Respondent asserted that the "mysterious modification [in 2005] casts an enormous shadow of doubt over whether Tercero's actual date of birth was in 1979 as he asserts."  (Instrument No. 53 at 12).

Tercero filed a reply.  Tercero first contrasted Villanueva's description of the official records in Chichigalpa against Respondent's unverified statements about the 2005 rectification. Given the unsupported nature of those statements, Tercero argued that he "should at the very least be entitled to obtain this information either by testimony or deposition of the individuals who conducted the investigation, given the obvious disparity between the Petitioner's and the Respondent's information."  (Instrument No. 61 at 12).  Additionally, Tercero asked this Court to hold an evidentiary hearing.  (Instrument No. 61 at 13).

Given the record, the Court ordered the parties to clarify how the AEDPA applied to the *Roper* claim, whether factual development was available or necessary, and whether any additional matters needed resolution before proceeding to adjudication.  (Instrument No. 62). Respondent subsequently asked the Court to confine its review to the evidence and argument Tercero presented in his successive state habeas application and, under the AEDPA's deferential review, find his *Roper* claim to be without merit.  (Instrument No. 71).  Tercero contended that, by ignoring the weight of evidence he adduced on federal review, the state court's adjudication does not merit deference under the AEDPA.  Tercero urges the Court to allow full factual development and hold an evidentiary hearing to resolve lingering concerns.  (Instrument No. 76).

## II.    Application of the AEDPA

The application of the AEDPA is a threshold concern in this case. The AEDPA, which "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt," codifies traditional principles of finality, comity, and federalism that underlie federal habeas review. *Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010) (quotations omitted). With particular applicability to the instant case, the AEDPA restricts both the nature and scope of federal habeas review.

The AEDPA generally "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, ___ U.S. at ___, 131 S. Ct. 770, 784 (2011). Even when a state court denies the merits of an inmate's constitutional claims, however, some circumstances may disentitle that decision to AEDPA deference. The Supreme Court has identified certain classes of offenders who the Constitution protects from execution. Capital defendants who are incompetent, mentally retarded, or below age 18 are exempt from society's ultimate punishment. Given that absolute prohibition, the severity of the punishment, and the irreversibility of error, the Constitution places high demands on a state court's assessment of whether a death-row inmate qualifies for those constitutional protections. In that narrow range of cases, the state courts must provide an inmate an adequate opportunity to develop his claims before AEDPA deference applies on federal review. *See Panetti v. Quarterman,* 551 U.S. 930, 953 (2007); *Blue v. Thaler*, 665 F.3d 647, 656-67 (5th Cir. 2011); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010); *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007).[15]

---

[15] Courts have thus far only applied this exception in the case of categorical exceptions to the death penalty, such as incompetence under *Ford v. Wainwright*, 477 U.S. 399 (1986) and mental retardation under *Atkins v. Virginia*, 536 U.S. 304, 311–314 (2002). *Roper* claims, like those brought under *Ford* and *Atkins*, "affirmatively limit the class of persons who are death penalty eligible[.]" *Rivera*, 505 F.3d at 358; *see also Graham v. Florida*, ___ U.S.

24 / 31

The Court ordered the parties to "discuss whether the state courts satisfied Tercero's rights by denying relief without holding a hearing, or even addressing much of the evidence he had adduced in federal court." (Instrument No. 62 at 8). After that briefing, the Court finds that the state courts afforded Tercero all the process he was due. "Due process does not require a full trial on the merits," but only an "'opportunity to be heard.'" *Rivera*, 505 F.3d at 358 (quoting *Ford v. Wainwright*, 477 U.S. 399, 424 (1986) (Powell, J., concurring in part and concurring in the judgment)); *see also Hines v. Thaler*, 456 F. App'x 357, 363 (5th Cir. 2011). The state courts allowed Tercero to file a successive habeas application and did not limit the evidence he could attach to that pleading. Tercero chose to emphasize only a portion of the information he had amassed on federal review. Even though the State attached to its response the full breadth of evidence developed, Tercero did not signal to the state courts that the federal evidence needed airing in a state hearing. While asking the state courts to provide resources to establish his claims, Tercero never gave the state courts any indication that he wished to resolve inconsistencies between the various birth certificates and the unusual story about his older brother.

The state courts gave Tercero an opportunity to be heard, and he chose to limit what the courts would consider. As Respondent observes, "[t]he fact that Tercero failed to take advantage of the opportunity to present evidence – again, his briefing on the issue consisted of only one page and his evidentiary support was limited to only one relevant exhibit – does not mean he was denied the opportunity." (Instrument No. 71 at 7-8). The AEDPA, therefore, applies to his *Roper* claim.

Tercero's age at the time of the murder is a question of fact, reviewed under 28 U.S.C.

---

___, 130 S. Ct. 2011, 2022 (2010) (placing *Roper* claims in the same group as *Ford* and *Atkins* claims in which the Supreme Court "has adopted categorical rules prohibiting the death penalty"). The Court will assume that the States must also hold a full and fair hearing into the merits of a properly raised *Roper* claim.

§ 2254(d)(2).   Under § 2254(d)(2) a court may grant habeas relief "only if the state court's adjudication of his claim on the merits . . . 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   *Rabe v. Thaler*, 649 F.3d 305, 308 (5th Cir. 2011).   Under section 2254(d)(2), a petitioner must show more than that a state court's decision was incorrect or erroneous; the decision must be objectively unreasonable, "a substantially higher threshold."   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).   Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's  . . . determination."   *Rice v. Collins*, 546 U.S. 333, 341-42 (2006); *see also Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 849 (2010).   A petitioner must show that "a reasonable factfinder *must* conclude" that the state court's determination of the facts was unreasonable.   *Rice*, 546 U.S. at 341 (emphasis added).[16]

Similarly, the AEDPA provides substantial deference to a state court's resolution of factual issues.   Here, the Texas state courts made detailed and comprehensive fact findings on habeas review.   Federal courts must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and

---

[16] Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U .S.C. § 2254(e)(1). The Fifth Circuit has observed that "[t]he relationship between this provision and § 2254(d)(2) is ambiguous." *Hines v. Thaler*, 456 F. App'x 357, 364 n.5 (5th Cir. 2011). The Supreme Court has "explicitly left open the question whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)[.]" *Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 849 (2010); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (refusing to decide "whether and when" to use the presumption of correctness in 2254(d)(2) cases). A split exists among the circuit courts as to the interrelationship between those AEDPA provisions. The Fifth Circuit has instructed that "the clear-and-convincing evidence standard of § 2254(e)(1) —which is arguably more deferential to the state court than is the unreasonable-determination standard of § 2254(d)(2) — pertains only to a state court's determinations of particular factual issues, while § 2254(d)(2) pertains to the state court's decision as a whole." *Blue*, 665 F.3d at 654; *see also Valdez v. Cockrell*, 274 F.3d 941, 951 n. 17 (5th Cir. 2001). This Court must follow Fifth Circuit precedent and apply 28 U.S.C. §2254(e)(2) to the specific factual findings and 28 U.S.C. §2254(d)(2) to its ultimate legal conclusion.

convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341.

 The AEDPA also confines what evidence this Court may consider.  Because Tercero chose to limit the case he put before the state court himself, and the state courts did not explicitly mention the evidence Respondent attached to the response, the Court must decide what evidence will inform its review.  In *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399-1400 (2011), the Supreme Court reasoned that, because "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," federal review only examines "the record that was before that state court."  Relying on *Pinholster*, Respondent asks the Court to limit its review under the AEDPA to the scant evidence Tercero attached to his successive state decision.  Recognizing that the State included the entire federal record in its pleadings, Respondent states that "they were attached solely in an administrative fashion to demonstrate the procedural history of the case" (Instrument No. 71 at 14).  According to Respondent's reading of *Pinholster*, federal review under the AEDPA is apparently bound to the evidence presented by the petitioner on state habeas review.

 No case has circumscribed federal review to that extent.  In light of *Pinholster*, courts should consider "the record that was before the state habeas court."  *Clark v. Thaler*, 673 F.3d 410, 416-17 (5th Cir. 2012).  The *Pinholster* decision, however, did not limit the evidence to only that presented by one party or explicitly mentioned by the state court.  *Pinholster* rested on how the "AEDPA's statutory scheme is designed to strongly discourage" inmates from "submit[ing] new evidence in federal court," not on limiting federal consideration of evidence plainly before the state courts.  *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1401.  This Court will consider all the evidence in the state court record.

The state courts did not issue any factual findings that explicitly mentioned some of the evidence attached to the State's response. Silence, however, does not disentitle the state court decision to AEDPA deference. "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th Cir. 2001). This Court considers the state courts to have found any evidence contrary to its decision to be without credibility or not as persuasive as that on which it explicitly based its reasoning.

Having framed the prism through which the record is seen, the Court turns to Tercero's *Roper* claim.

## III.    Tercero Has Not Shown an Entitlement to Federal Habeas Relief

Before the Supreme Court held that the Constitution outlaws the execution of juvenile offenders, Tercero repeatedly and consistently gave his date of birth as being well before he could become eligible for that constitutional safeguard. Friends and family members testified at trial in a manner inconsistent with *Roper* protection. Official documents verified their testimony. Only when a later birth could save him from execution did Tercero allege that he was born in 1979. Even then, the information about that date has suspiciously come out responsively and in stages.

The arguments Tercero raised in his successive state habeas application were the same that he initially put before this Court: bare reliance on the 1979 Chichigalpa birth certificate. The origin and timing of that document have brought its credibility into question. Tercero has never adequately explained the puzzling modification of its inscription only weeks after the Supreme Court issued *Roper*. The record contains no hint of who quickly acted to modify Nicaraguan birth records after the *Roper* or why they did so only then.

Tercero's initial invocation of the *Roper* decision did not mention any rectification of an earlier certificate.  Only when Respondent challenged the source of that exhibit did the story of a dead older brother born on the same day three years earlier begin to unfold.  Even then, the story comes before this Court only through hearsay declarations from Villanueva and unauthenticated declarations from family members.  Allegations without a strong evidentiary foundation do not amount to clear and convincing evidence that would undercut well-supported state findings.

Tercero's successive habeas application did not include those documents or any argument relating to an older brother.  Only Respondent's filings put that information before the state courts.  Tercero now faults the state courts for not reconciling those declarations with its factual determination, yet he never explained their contents to the state courts.[17]  Notwithstanding the fact that the state courts did not explicitly mention the affidavits secured by Villanueva, the state habeas decision necessarily implies that the story they told was not credible, or at least less credible than Tercero's constant reliance on an earlier birth date.  The AEDPA affords significant deference to the state habeas determination, and Tercero's federal arguments do not undercut the integrity of its reasoning.

Importantly, Tercero's pleadings never explain how he came to confuse himself with that mysterious sibling or why his entire life he relied on his brother's date of birth.[18]  Tercero has

---

[17] The differences between the trial testimony and the unverified declarations go beyond merely establishing the date of Tercero's birth.  For instance, when ordering the parties to return to state court the Court observed: "The testimony and evidence at trial, as well as the new affidavits, give widely varying accounts of Tercero's parentage.  The failure to identify his correct father has muddied the accounts of two sons named Bernardo Aban Tercero and raises credibility questions."  (Instrument No. 32 at 7-9).  Tercero's mother testified at trial that she never married Tercero's father because he was already married.  Tr. Vol. 23 at 191.  Tercero's uncle verified that story.  Tr. Vol. 23 at 197.  Tercero's mother says in her declaration, however, that "she married at very young age" but her "husband abandoned" her when she was "pregnant with [her] first child in 1976." (Instrument No. 31, Exhibit 3).  A neighbor, however, remembered when "she was pregnant with her second son in 1979" that "[h]er husband had left her and returned when he heard she was pregnant," but "left after [the baby] was born."  (Instrument No. 31, Exhibit E).  Tercero has never explained the difference between these accounts.

[18] Only a document purporting to be an affidavit from Tercero's grandmother explains why he claimed to be older.  (Instrument No. 61, Exhibit 2).  This document is of questionable origin and has not been authenticated.

never established why he continually relied on the earlier birth date, both when in the United States and after returning to Nicaragua. His consistent reliance on the earlier date casts a long shadow over the information collected by Villanueva.

The suspicious timing of Tercero's *Roper* claim, the problematic and evolving tale of his alleged older sibling, the weak evidentiary foundation for his arguments, and the pervasive and consistent pre-*Roper* information makes this not a case where "a reasonable factfinder *must* conclude" that the state court's determination of the facts was unreasonable. *Rice*, 546 U.S. at 341 (emphasis added). This Court agrees with the state court that "in light of the ample documentation of and [Tercero's] prior continual assertion of a birthdate establishing that he was well over the age of eighteen at the time of the offense," the "alleged birth record . . . asserting a birthdate of August 20,1979" is "unpersuasive and incredible." Successive State Habeas Record at 352. Tercero has not shown that the state habeas process "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Court will deny Tercero's *Roper* claim.

## CERTFICATE OF APPEALABILITY

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); Fed. R. App. Pro. Rule 22(b). Tercero has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte. See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when "the applicant has made a substantial

---

(Instrument No. 48). Tercero's grandmother allegedly avers that, after Tercero came to the United States in 1994, he had difficulty securing work because of his age. His grandmother allegedly sent him a rectified copy of his older brother's birth certificate that she secured in Posoltega. She does not explain, however, why he relied on that earlier birthdate after he returned to Nicaragua. This Court cannot consider the substance of that document under *Pinholster* because Tercero has never presented it to the state courts.

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The application of the AEDPA in this case is clear and conclusively bars relief.  Under the appropriate standard, Tercero has not shown that this Court should authorize appellate consideration of any claim.  This Court will not certify any issue for review by the Fifth Circuit.

## CONCLUSION

Tercero has not shown an entitlement to federal habeas relief.  This Court **DENIES** Tercero's petition and **DISMISSES** this case **WITH PREJUDICE**.  No Certificate of Appealability will issue in this case.

SIGNED at Houston, Texas, this 7th day of February, 2013.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE